[No. A104819. First Dist., Div. Three. June 20, 2005.]

KIMA MEGRABIAN et al., Plaintiffs and Respondents, v.
RITA SAENZ, as Director, etc., Defendant and Appellant.

---

---

**COUNSEL**

Bill Lockyer, Attorney General, James M. Humes and Thomas R. Yanger, Assistant Attorneys General; Douglas M. Press and Karin S. Schwartz, Deputy Attorneys General, for Defendant and Appellant.

National Senior Citizens Law Center, Gerald A. McIntyre; Western Center on Law & Poverty, Richard A. Rothschild; National Immigration Law Center, Tanya Broder; National Immigration Law Center, Linton Joaquin; Legal Assistance for Seniors, Patricia G. Price; Bet Tzedek Legal Services and Grant R. Specht for Plaintiffs and Respondents.

---

**OPINION**

**PARRILLI, J.**—Welfare and Institutions Code sections 18938 and 18940 determine eligibility for benefits under California's Cash Assistance Program for Aged, Blind, and Disabled Legal Immigrants (CAPI). (Welf. & Inst. Code, § 18937 et seq.)[1] An immigrant is eligible for CAPI benefits based in part on whether he or she "entered the United States on or after August 22, 1996." (§ 18938, subd. (a)(2) & (3).) There are no California cases construing section 18938 or the phrase "entered the United States" as used in that statute.

██ Rita Saenz (Appellant) is director of the California Department of Social Services (DSS), which is charged with supervising CAPI. (§ 18937.) The DSS has construed "entered the United States" in section 18938 to mean the date an immigrant attained his or her current immigration status. (Cal. Dept. Social Services Manual of Policies & Procedure § 49-020.4 (MPP).) Kima Megrabian, Norair Chitechyan, Ji Qun Shi and Jin Kan Zhang (Respondents) were denied CAPI benefits under the DSS's construction. They contend interpretation of the phrase should be governed by a

---

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

federal regulation interpreting the same phrase in a nonanalogous federal statute to mean physical entry on or after August 22, 1996. The trial court ordered the DSS to use the federal interpretation and granted Respondents' petition for a writ of mandate; the DSS appeals. We conclude the DSS's interpretation of section 18938 is entitled to our deference. We reverse.

## BACKGROUND

I. *Personal Responsibility and Work Opportunity Reconciliation Act.*

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA). (8 U.S.C. § 1601 et seq.) PRWORA severely restricted the eligibility of legal immigrants for federally funded benefits otherwise provided to needy persons, including benefits under the federal Supplemental Security Income (SSI) program for the aged, blind, and disabled. Many legal immigrants lost their eligibility for such benefits as of August 22, 1996, the effective date of PRWORA. (*Teytelman v. Wing* (2003) 2 Misc.3d 608 [773 N.Y.S.2d 801, 803–804] *(Teytelman)*; 8 U.S.C. §§ 1612, 1613; Kurzban, Immigration Law Sourcebook (9th ed. 2004) p. 676 (Kurzban).) In particular, with limited exceptions, immigrants who were not "qualified aliens"[2] as of that date were denied eligibility for any federal public benefits. (*Teytelman, supra,* 773 N.Y.S.2d at p. 804; 8 U.S.C. § 1611(a).)

Congress enacted PRWORA in part to promote self-sufficiency and to discourage aliens from immigrating to the United States just to avail themselves of welfare or other public resources. (8 U.S.C. § 1601; *Aliessa ex rel. Fayad v. Novello* (2001) 96 N.Y.2d 418, 425 [754 N.E.2d 1085, 1090, 730 N.Y.S.2d 1].) In PRWORA, Congress expressly authorized the states to fund their own public benefit programs for immigrants who no longer qualified for federal benefits and authorized them to establish their own eligibility criteria. (8 U.S.C. §§ 1622, 1624, 1632; Kurzban, *supra*, p. 676.)

II. *CAPI.*

█ In 1998, the California Legislature enacted CAPI to provide benefits to qualifying aged, blind and disabled legal immigrants who, as a result of PRWORA, are no longer eligible for federal SSI benefits due solely to their

---

[2] A "qualified alien" is an alien who, at the time he or she applies for aid, is (1) an alien lawfully admitted for permanent residence (LPR); (2) an alien granted asylum; (3) a refugee; (4) an alien paroled into the United States for a period of at least one year; (5) an alien whose deportation is being withheld; (6) an alien granted conditional entry; or (7) an alien who is a Cuban and Haitian entrant. (8 U.S.C. § 1641(b).) Certain battered aliens are also treated as "qualified aliens." (8 U.S.C. § 1641(c).)

immigration status. (§§ 18937, 18938, subd. (a); Stats. 1998, ch. 329, § 38.) CAPI provides a monthly subsistence grant to low-income persons who would have been eligible for federal SSI under the immigrant rules in effect before enactment of PRWORA, and who otherwise meet the criteria for SSI benefits. (§§ 18938, subd. (a)(1), 18941.) Eligible immigrants include (1) LPR's; (2) immigrants permanently residing in the United States under color of law (PRUCOL's), i.e., residing in this country with the knowledge and permission of immigration authorities who do not plan to deport them (MPP, *supra*, § 49-005(p)(3)); and (3) other "qualified aliens."[3] (MPP, *supra*, § 49-020.12.)

■ Eligibility for CAPI benefits is determined in part by section 18938—the statute at issue in this case. Section 18938 sets forth three eligibility groups based in part on whether the applicants entered the United States before August 22, 1996, or on or after that date: (1) immigrants who entered before that date; (2) immigrants who entered on or after that date and whose sponsors are dead, disabled, or abusive; and (3) other immigrants who entered on or after that date. (§ 18938, subd. (a)(1)–(3).) The group an immigrant falls into is relevant because it determines which sponsor-deeming rules for income apply. (§ 18940, subd. (b).) A sponsor is a person who signs a contract or "affidavit of support" agreeing to support an immigrant as a condition of his or her admission for permanent residence in the United States. (MPP, *supra*, § 49-005(s)(1).) Under sponsor-deeming rules, the income and resources of an immigrant's sponsor are added to that of the immigrant in determining whether the immigrant is eligible for CAPI (or federal SSI) benefits. (MPP, *supra*, § 49-037.1; 20 C.F.R. § 416.1160(a).) These rules can render an immigrant ineligible for CAPI for a specified number of years by attributing to him or her a greater income than is allowed under the program.

■ CAPI provides that applicants in the first two groups—immigrants who entered before August 22, 1996, or whose sponsors are dead, disabled or abusive—are governed by federal SSI sponsor-deeming rules. (§ 18940, subd. (b).) Under the federal rules, the number of years of sponsor deeming depends upon the type of affidavit of support the immigrant's sponsor signed. Depending on the affidavit, immigrants are either (1) subject to three years of sponsor deeming (old affidavit of support), or (2) subject to deeming until they become citizens or secure credit for 40 quarters of work history (new affidavit of support which is required for all applications for immigrant visas or for adjustments of status filed on or after December 19, 1997). (42 U.S.C. § 1382j(a); 8 U.S.C. 1631(a), (b); MPP, *supra*, § 49-005(a)(1); see also Wheeler, *Immigration Act Imposes New Sponsorship Requirements, Modifies*

---

[3] "Qualified alien" is defined the same under CAPI as in 8 U.S.C. section 1641. (MPP, *supra*, § 49-005(q)(1); see fn. 2, *ante*.)

*Restrictions on Benefits*, Bender's Immigration Bulletin, Vol. 1, No. 13, pp. 6, 8.) Because many immigrants eligible for CAPI may never become citizens or be able to complete 40 quarters of work due to their age or disability, those whose sponsors signed the new affidavit of support could be subject to indefinite sponsor deeming.

■ Immigrants in the third group—immigrants who entered on or after August 22, 1996, and whose sponsors are not dead, disabled or abusive—are not affected by which federal affidavit of support their sponsor signed. Instead, they are subject to 10 years of deeming of their sponsors' income and resources, regardless of the affidavit signed. CAPI's 10-year deeming period starts from the date the sponsor signed the affidavit of support or "the date of the immigrant's arrival in the United States, whichever is later." (§ 18940, subd. (b).)

■ The DSS determines when an immigrant "entered the United States" for purposes of determining eligibility for CAPI under sections 18938 and 18940 based not on the date an immigrant physically arrived in the United States, but on "the effective date of the non-citizen's current immigration status as determined by the Immigration and Naturalization Service." (MPP, *supra*, § 49-020.4.) There are two exceptions. First, if the immigrant is a current CAPI recipient whose immigration status was adjusted after he or she began receiving CAPI benefits, then the DSS continues to use the same entry date that was used to determine his or her initial CAPI eligibility. (MPP, *supra*, § 49-020.41.) Second, if the immigrant was a "qualified alien" (e.g., LPR)[4] as of August 21, 1996, and has maintained continuous residence in the United States since that date, then the effective date of the "qualified alien" status held on August 21, 1996, will be deemed to be his or her "entry date" even if he or she later adjusts his or her immigration status. (MPP, *supra*, § 49-020.42.)

The DSS implemented the CAPI program in December 1998. Since May 2000, the interpretation set forth above of section 18938 has consistently been DSS policy. By September 2002, the DSS's interpretation had appeared in an administrative decision not involving Respondents. The DSS designated the portion of the decision containing its interpretation a "Precedential Decision." (Gov. Code, § 11425.60, subd. (b) ["An agency may designate as a precedent decision a . . . part of a decision that contains a significant legal or policy determination of general application that is likely to recur"].) The interpretation became an emergency regulation about four months later. By October 2003, it had become a permanent DSS regulation. (MPP, *supra*, § 49-020.4.)

---

[4] See fn. 2, *ante,* for a list of qualified aliens.

III. *Facts Relating to Respondents and Their Administrative Records.*

The facts relating to the Respondents are undisputed. They are two elderly, immigrant couples, each of whom physically arrived in the United States on tourist visas before August 22, 1996. They all became LPR's after August 22, 1996. After they applied for CAPI benefits, the DSS determined they "entered" the United States on or after August 22, 1996, for purposes of section 18938 based on the dates they obtained their LPR status. Relying on their date of entry and sponsor circumstances, the DSS concluded Respondents were not then eligible for CAPI benefits.

IV. *Writ of Mandate Proceedings.*

On September 10, 2002, Respondents filed a petition for a writ of mandate to compel the DSS director to cease denying CAPI benefits to eligible applicants as a result of the DSS's interpretation of section 18938, and to overturn the administrative decisions denying Respondents CAPI benefits. (Code Civ. Proc., §§ 1085 [power to issue writ of mandate], 1094.5 [writ issued regarding validity of administrative decision].) On September 30, 2003, judgment was entered in Respondents' favor. On the same date, the trial court issued a writ of mandate commanding the DSS director to interpret the phrase "entered the United States on or after August 22, 1996" in section 18938, subdivision (a)(2) in the same way the Social Security Administration interpreted that same phrase (albeit in present tense) in title 8 United States Code section 1613, i.e., to mean physical entry. (Soc. Sec. Admin., Program Operations Manual System SI 00502.135 (POMS).) The DSS director timely filed a notice of appeal.

## DISCUSSION

I. *Standard of Review of the Trial Court Judgment.*

■ The underlying facts are undisputed in this case, and the issue before us is one of law. We review the trial court's judgment independently. (*Helene Curtis, Inc. v. Assessment Appeals Bd.* (1999) 76 Cal.App.4th 124, 128 [90 Cal.Rptr.2d 31] (*Helene Curtis*); *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785, 794 [85 Cal.Rptr.2d 844, 978 P.2d 2] (*Ramirez*).)

II. *Standard of Review of the DSS's Interpretation of "Entered the United States on or After August 22, 1996."*

A. *The Legal Standard: Quasi-legislative Versus Interpretive.*

■ There are two classes of agency-made rules or regulations—quasi-legislative and interpretive. Because of their differing legal sources, they

"command significantly different degrees of deference by the courts." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) Quasi-legislative rules or regulations are the product of a delegated legislative power conferred on the agency to make law. (*Id.* at pp. 7, 8.) An agency acts in its quasi-legislative capacity when it adopts rules or "regulations to fill in the details of the statutes enacted by the Legislature." (*Helene Curtis, supra,* 76 Cal.App.4th at p. 129.) The scope of review of quasi-legislative acts is narrow. If the rule or regulation lies "within the lawmaking authority delegated to the agency by the Legislature," and "it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Yamaha, supra,* 19 Cal.4th at pp. 10–11.)

In contrast, we accord considerably less deference to an agency's interpretation of a statute when it is merely "an agency's *legal opinion,* however 'expert,' rather than the exercise of a delegated legislative power to make law." (*Yamaha, supra,* 19 Cal.4th at p. 11.) The binding power of an agency's interpretation of a statute in this situation depends upon "the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7.) "Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court." (*Ibid.*) However, the interpretation is entitled to our consideration and respect. (*Ibid.*)

█ The court in *Yamaha* noted agency rules "do not always fall neatly into" either the quasi-legislative or interpretive category; "the terms designate opposite ends of an administrative continuum, depending on the breadth of the authority delegated by the Legislature." (*Yamaha, supra,* 19 Cal.4th at p. 7, fn. 3.) In *Ramirez,* the Supreme Court addressed the situation where an interpretive regulation falls into both categories due to the authority delegated to the agency. The Legislature had delegated to the Industrial Welfare Commission quasi-legislative power to make regulations setting minimum wages, maximum hours and standard conditions of labor for all employees. (*Ramirez, supra,* 20 Cal.4th at p. 795.) This agency had formulated a regulation defining the term "outside salesperson" in a statute excluding from overtime laws an employee characterized as such. (*Id.* at p. 789.)

█ The Supreme Court in *Ramirez* observed that regulations "have both quasi-legislative and interpretive characteristics . . . when an administrative agency exercises a legislatively delegated power to interpret key statutory terms." (*Id.* at p. 799.) It concluded the regulation defining "outside salesperson" was quasi-legislative because the legislative authority delegated to the agency included "the power to elaborate the meaning of key statutory terms. On the other hand, since the [agency] is engaged in construing the meaning of a portion [of a statute], its regulation is in some sense interpretive." (*Id.* at

p. 800.) The court then went on to analyze the regulation under both the more deferential standard for quasi-legislative regulations, and under the less deferential standard for purely interpretive regulations. (*Id.* at pp. 800–801.)

Similarly, in this case, the DSS's interpretation of section 18938 had quasi-legislative and interpretive characteristics. Its interpretation, now embodied in a regulation, was quasi-legislative because the Legislature gave the DSS the power to "adopt regulations, orders, or standards of general application to implement, interpret, or make specific the law enforced by" it, including CAPI. (§ 10554; see also §§ 18937 [DSS given authority to "establish and supervise" the CAPI program], 18943, subd. (a) [allowing DSS to "implement" CAPI provisions "through all county letter or similar instructions from the director"; requiring DSS director to "adopt regulations, as otherwise necessary, to implement the applicable provisions of" CAPI; empowering director to enact emergency CAPI regulations].) On the other hand, the DSS construed the meaning of a portion of a statute, and thus "its regulation is in some sense interpretive." (*Ramirez, supra,* 20 Cal.4th at p. 800.) Consequently, we analyze the DSS's interpretation of section 18938 under both the more deferential standard for quasi-legislative acts, and under the less deferential standard for purely interpretive ones. (*Id.* at pp. 800–801.) We conclude the interpretation is entitled to our deference under both standards.

### B. *Quasi-legislative Analysis.*

#### 1. *The DSS's Interpretation Was Within the Scope of the Authority Conferred upon It.*

Analyzing the DSS's interpretation as quasi-legislative, we first determine that it is within the scope of the authority conferred on the DSS. (*Ramirez, supra,* 20 Cal.4th at p. 800.) The DSS's power "to implement, interpret, or make specific" section 18938 was triggered by the ambiguity of the phrase "entered on or after August 22, 1996" in that statute. (§ 10554; see *Helene Curtis, supra,* 76 Cal.App.4th at p. 129 ["agency granted quasi-legislative powers may . . . adopt regulations to fill in the details of the statutes enacted by the Legislature"].)

This case involves an intersection of federal and state immigration and public benefits laws. In this context, there are varying definitions of "entry." "The dictionary definition of 'entry' is to go or come into a material place: make a physical entrance or penetration.' *Webster's Third New International Dictionary* 756 (1981). . . . 'Entry' is also defined as 'to come into a group: gain admission.' *Id.* In immigration law, the term 'entry' also has different denotations." (*Digamon v. Sullivan* (D.Md. 1993) 813 F.Supp. 404, 408

(*Digamon*); see also *Matter of Connelly* (1984) 19 I.&N.Dec. 156, 159 ["entry" is a term of art of immigration law].) Indeed, there is no current federal statutory definition of "entry" for immigration law. In 1996, shortly after enacting PRWORA, Congress reduced the significance of "entry" in immigration law by striking the statutory definition of "entry" and replacing it with a definition for "admission." (Kurzban, *supra*, p. 36; 8 U.S.C. § 1101(a)(13)(A).) Moreover, the ambiguity of the term is apparent in the CAPI provisions themselves. The Legislature used "entered" in section 18938, but section 18940 refers to "the date of the immigrant's arrival in the United States." (§ 18940, subd. (b).) This suggests the Legislature meant something other than "arrival in the United States" when it used "entered the United States" in section 18938. Thus, "[i]n isolation, the term 'entry' is ambiguous." (*Digamon, supra,* 813 F.Supp. at p. 408.)

The ambiguity of the phrase "entered the United States" is shown by the conflicting definitions courts and agencies have applied to it and similar phrases. In construing the phrase "entry into the United States" in order to determine when a three-year federal sponsor-deeming rule for SSI begins to run, the district court in *Digamon* concluded it meant the date the immigrant was admitted to permanent residence in the United States. (*Digamon, supra,* 813 F.Supp. at pp. 406–408; 20 C.F.R. § 416.1160(a)(3) [regulation promulgated by Secretary of Health and Human Services providing same interpretation of this statute]; see also *Aziz v. Sullivan* (E.D.Va. 1992) 800 F.Supp. 1374, 1375 (*Aziz*) [construing same phrase in federal sponsor deeming statutes for AFDC and food stamp programs to mean date of admission to permanent residence]; 62 Fed.Reg. 61344, 61415 [in context of determining for 8 U.S.C. § 1613 when five-year ban on federal benefits for immigrants starts to run, interpreting "entry into the United States" to mean date immigrant "attained qualified alien status"].)

Other courts and federal agencies have interpreted similar phrases to mean some form of physical arrival. (See, e.g., *U.S. v. Parga-Rosas* (9th Cir. 2001) 238 F.3d 1209, 1213 [interpreting "entry into the United States" in the context of a deported alien charged with being " 'found in' " the United States to mean physically present here and free from official restraint]; *Yang v. Maugans* (3rd Cir. 1995) 68 F.3d 1540, 1545 ["entered the United States" within the meaning of the Immigration and Nationality Act of 1952 means (1) physical presence; (2) inspection and admission by immigration officer, or evasion of inspection; and (3) freedom from official restraint]; 62 Fed.Reg. 61344, 61415 [in context of determining for 8 U.S.C. § 1613 when five-year ban on federal benefits for immigrants is triggered, interpreting "enters the United States on or after August 22, 1996" to mean physical entry on or after that date].)

Moreover, contrary to what Respondents argue, the DSS was not required to follow a federal regulatory interpretation of the phrase "entered on or after August 22, 1996." In particular, Respondents argue the trial court correctly ordered the DSS to adopt the Social Security Administration's interpretation of this phrase in title 8 United States Code section 1613(a) to mean physical entry on or after that date.[5] (POMS, *supra*, SI 00502.135.B.1; 62 Fed.Reg. 61344, 61415.)

In *Ramirez*, the state agency's definition of a statute's ambiguous term ("outside salesperson") differed substantially from definitions of the same term found in federal regulations. The Supreme Court concluded the agency did not exceed its statutory authority when it adopted its own unique definition because there was no indication the Legislature intended to incorporate those federal regulations when it adopted the statute at issue. (*Ramirez, supra*, 20 Cal.4th at pp. 796, 800–801.) Similarly, there is no indication in this case that the Legislature intended to incorporate federal interpretations of the phrase "entered on or after August 22, 1996" as it appears in title 8 United States Code section 1613.

Respondents point out that, in general, federal laws and regulations governing the SSI program also govern CAPI. (§ 18940, subd. (a); MPP, *supra*, § 49-001.2 [DSS regulation interpreting § 18940 to mean CAPI is governed by SSI "laws and regulations pertaining to eligibility"].) However, the regulation interpreting title 8 United States Code section 1613 (62 Fed.Reg. 61344, 61414–61415) is not, strictly speaking, a regulation governing the federal SSI program. The statute this regulation interprets provides that any qualified alien "who enters the United States on or after August 22, 1996" is generally ineligible for "any Federal means-tested . . . benefit" for a five-year period. (8 U.S.C. § 1613(a).) While the statute has been interpreted to affect entitlement to SSI, it also affects entitlement to nonemergency Medicaid, the State Children's Health Insurance Program (SCHIP), and Temporary Assistance for Needy Families (TANF). (Kurzban, *supra*, p. 676.)

More importantly, title 8 United States Code section 1613 is not analogous to section 18938. Consequently, applying a federal regulation interpreting the phrase "enters the United States on or after August 22, 1996" in title 8 United States Code section 1613 simply because the same phrase appears in section 18938 does not make sense. Section 18938 determines whether an immigrant

---

[5] The trial court ordered the DSS to comply not with a federal regulation, but with the Social Security Administration's interpretation of title 8 United States Code section 1613 found in its Program Operations Manual System. However, the Attorney General promulgated a regulation with a largely identical interpretation of the statute. (62 Fed.Reg. 61344, 61414–61415.)

will be subject to federal sponsor-deeming rules or CAPI's 10-year sponsor-deeming rule, and uses the phrase as a means of making this determination. (§§ 18938, subd. (a), 18940, subd. (b).) As the DSS points out, there is no counterpart to this statute in the federal SSI program because applicants for that program are subject to federal sponsor-deeming rules only. And title 8 United States Code section 1613 has nothing to do with sponsor-deeming rules; it uses the phrase "enters the United States" to determine which immigrants are subject to a five-year ban on all federal means-tested benefits, regardless of the income and resources of their sponsors. (Cf. *State, Dept. of Revenue v. Andrade* (Alaska 2001) 23 P.3d 58, 74 [phrase "lawfully admitted for permanent residence in the United States" in state statute should not be construed identically to federal definition, notwithstanding federal government's preeminent role in immigration, where state and federal statutes served different purposes]; *Delaney v. Baker* (1999) 20 Cal.4th 23, 42 [82 Cal.Rptr.2d 610, 971 P.2d 986] [a phrase which appears in different statutory schemes with "distinct designs and objectives" is not presumed to have the same meaning in each instance].)[6]

### 2. *The DSS's Interpretation Was Reasonably Necessary to Effectuate the Purpose of Section 18938.*

We next determine whether the DSS's interpretation was reasonably necessary to effectuate the purpose of section 18938. (*Ramirez, supra,* 20 Cal.4th at p. 800 [second prong of quasi-legislative analysis].) As we discuss, *ante,* the DSS needed to interpret the phrase at issue because it is ambiguous. Furthermore, the DSS interpretation is reasonable. (See *id.* at p. 801 [concluding agency's interpretation of " 'outside salesperson' is reasonable and should not be invalidated"].) It reasonably addresses a main purpose of the statute: to determine which sponsor-deeming rules apply to an immigrant seeking CAPI benefits. In fact, the phrase "entered the United States on or after August 21, 1996" is only relevant in the statute to determine whether federal sponsor-deeming rules apply to a particular immigrant, or whether instead CAPI's own 10-year sponsor-deeming rule applies. (§§ 18938, subd. (a)(2), (3), 18940, subd. (b).)

 Obviously, sponsor-deeming rules are only relevant to an immigrant who has a sponsor. An immigrant obtains a sponsor when he or she seeks to

---

[6] Another phrase concerning when an immigrant enters—"entry into the United States"—appears later in title 8 United States Code section 1613 in the context of determining when, once triggered, the statute's five-year ban on federal benefits starts to run. Consistent with the different contexts in which the two "entry" phrases appear in the statute, the same federal regulation interprets "entry" in this later phrase differently from "enters" in the phrase at issue in this case—namely, to mean "the date the [immigrant] attained qualified alien status." (62 Fed.Reg. 61344, 61415.) This definition is very similar to the one adopted by the DSS for section 18938. (MPP, *supra,* § 49-020.4.)

become a permanent resident; obtaining a sponsor is a federal requirement for gaining LPR status. In contrast, at the time an immigrant physically entered the country, he or she may not have had a sponsor. (8 U.S.C. § 1183a; see also *Aziz, supra,* 800 F.Supp. at p. 1378 [alien's mere physical entry into the United States does not require sponsorship; sponsor only necessary when an alien seeks permanent resident status]; *Digamon, supra,* 813 F.Supp. at p. 408 [same].) The purpose of the sponsor requirement is to prevent aliens from becoming public charges. (*Aziz, supra,* 800 F.Supp. at p. 1378.) Currently, a sponsor must enter into a contract, enforceable by the state or federal government or agency providing public benefits, to provide support for the immigrant applying for permanent resident status until either the immigrant becomes a citizen or the immigrant has worked 40 qualifying quarters (approximately 10 years). (8 U.S.C. § 1183a(a); Kurzban, *supra,* p. 48.)

In *Digamon, supra,* 813 F.Supp. 404, the district court construed the phrase "entry into the United States" as used in title 42 United States Code section 1382j, a federal sponsor-deeming statute for SSI. This statute provides that, "[f]or purposes of determining eligibility for and the amount of" SSI benefits for an aged, blind or disabled immigrant, the sponsor's income and resources "shall be deemed to be the income and resources" of the immigrant "for a period of 3 years after the [immigrant's] entry into the United States." (42 U.S.C. § 1382j(a).) In order to determine when the three-year sponsor-deeming period began to run for the immigrant in the case, the court in *Digamon* had to determine whether she " 'entered' the United States when she physically entered the country, or when she was granted an adjustment in status to LPR." (*Digamon, supra,* 813 F.Supp. at p. 406.) The Secretary of Health and Human Services had promulgated a regulation defining "entry" in this statute to mean "admission to permanent residence." (*Ibid.* [citing 20 C.F.R. § 416.1160(a)(3)].) The DSS relied in part on that regulation in formulating its interpretation of the statute at issue in this case because the regulation interprets "entry" in a statute (42 U.S.C. § 1382j) which, like section 18938, is about sponsor-deeming.

In concluding consistent with the federal regulation that "entry" meant "admission to permanent residence," the court in *Digamon* noted that in order for an immigrant to be eligible for federal SSI, he or she must be either an LPR or "otherwise permanently residing in the United States under color of law . . . ." (*Digamon, supra,* 813 F.Supp. at p. 408 [citing 42 U.S.C. § 1382c(a)(1)(B)(i)].) "That definition [of eligible immigrants] excludes illegal aliens but includes aliens who have properly expressed the intent to become permanent residents. The triggering event is permanent residence and not mere physical entry." (*Ibid.*)

■ Similarly, it was reasonable for the DSS to conclude the "triggering event" for selection of the appropriate sponsor-deeming rule under sections 18938 and 18940 is permanent residence, not physical entry. (See *Digamon, supra,* 813 F.Supp. at p. 408.) Only immigrants who have permanent resident status are eligible for CAPI benefits. (See § 18938, subd. (a)(1); 20 C.F.R. § 416.1600; MPP, *supra,* § 49-020.12 [to be eligible for CAPI, an immigrant must meet eligibility criteria for federal SSI in effect on August 21, 1996, i.e., be a U.S. resident with permanent resident status as an LPR, PRUCOL or "qualified alien"].) As explained, *ante,* an alien who does not have permanent resident status may not have a sponsor (and, in any event, is not eligible for CAPI). And for immigrants who are eligible for CAPI but who do not need sponsors, sponsor-deeming rules do not apply. For these two categories, the phrase at issue in section 18938, which determines the applicable sponsor-deeming rule, is irrelevant.

Respondents argue the DSS's interpretation of the phrase "entered on or after August 22, 1996" has no fixed meaning, and thus is improper. They incorrectly assert the DSS interpreted the phrase to mean the date an immigrant attains LPR status only. In fact, the DSS's interpretation is "the effective date of the non-citizen's current immigration status," whether that status be LPR, PRUCOL, or some other "qualified alien" status. (MPP, *supra,* § 49-020.4.) These eligible immigrants all have a date when their current immigration status became effective. More importantly, the DSS's interpretation of section 18938 has no effect on any eligible immigrants who are not required to have sponsors. By definition, sponsor-deeming rules do not apply to them. And the two exceptions the DSS carves out of its interpretation are reasonably necessary to ensure that immigrants who have had multiple adjustments to their immigration status are treated the same as immigrants who have not. (MPP, *supra,* §§ 49-020.41 [current CAPI recipient with change to immigration status keeps original entry date], 49-020.42 [qualified alien as of Aug. 21, 1996 keeps same entry date if later adjusts immigration status and has been continuously residing in U.S.].)

C. *Purely Interpretative Analysis.*

On the other hand, even if we considered DSS's regulation to be purely interpretative, it has "attributes which weigh in favor of considerable judicial deference." (*Ramirez, supra,* 20 Cal.4th at p. 801.) First, interpretation of section 18938 is entwined with issues of "policy and discretion," and the record shows the DSS was " 'sensitive to the practical implications of one interpretation over another.' " (*Yamaha, supra,* 19 Cal.4th at p. 12 [factors

indicating the agency has " 'a comparative interpretative advantage over the courts' " due to its expertise].) The same evidence also indicates senior DSS officials carefully considered the appropriate interpretation of section 18938. (*Yamaha, supra,* at p. 13 [such consideration weighs in favor of greater judicial deference; it indicates the agency's interpretation is likely to be correct].)

From December 1998, when CAPI was first implemented, until May 2000, DSS officials met with both DSS county representatives, who had "front-line" interaction with CAPI applicants, and with immigrant advocates. They examined factual scenarios under which immigrants would arrive in the United States. They considered four different possible interpretations of the phrase at issue, including one based on physical entry. In the end, the DSS adopted its current interpretation in part because, unlike the date of physical arrival, the date an immigrant attains his or her immigration status is easily verifiable by objective criteria. For CAPI applicants with LPR status, the immigrants most likely to be affected by the DSS interpretation of section 18938 (because they must have sponsors), this entry date appears on their resident alien cards. The DSS determined it would be administratively burdensome and expensive to adopt a physical entry interpretation because it would require verification of pre-August 1996 physical entries. The DSS concluded easy verification was consistent with CAPI's purpose of providing benefits to resident immigrants consistent with state resources. (§ 19.1, subd. (a) [purpose of public social services is to provide support for needy and dependent persons "within the limits of public resources"]; see also *Citicorp North American, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1420 [100 Cal.Rptr.2d 509] [agency should adapt its interpretation of statute to "fit the practicalities and present economic conditions"].)

In selecting its current interpretation, the DSS also sought to address the policy issue of how to handle "entry" for immigrants who physically enter and leave the United States multiple times, e.g., for tourism or to visit relatives. As the DSS recognized, section 18938 does not specify whether in this situation of multiple physical entries the DSS should use the earliest or most recent U.S. arrival. The DSS concluded CAPI benefit-eligibility should not be triggered by earlier visits to our country that may have had nothing to do with the immigrant's ultimate decision to become a resident. As in *Digamon*, discussed, *ante*, the DSS reasonably concluded the triggering event should instead be permanent residence. (*Digamon, supra,* 813 F.Supp. at p. 408.)[7]

---

[7] The federal regulation interpreting title 8 United States Code section 1613 also sought to address this policy concern. The trial court ordered the DSS to follow the "plain language" interpretation of this statute found in this regulation. Under that regulation, in order for an immigrant who did not obtain qualified alien status before August 22, 1996, to be treated as

■ Finally, the DSS interpretation has consistently been DSS policy since May 2000. Relative to when section 18938 was enacted and implemented (December 1998), the DSS interpretation is long-standing. (*Yamaha, supra,* 19 Cal.4th at p. 13 [evidence the agency has consistently maintained the interpretation in question, especially if it is long-standing, weighs in favor of greater judicial deference].) Respondents argue that the DSS's interpretation is a "convenient litigating position" not entitled to our deference. (See *id.* at p. 9 [contrasting pre-existing regulation or ruling of general application with interpretation which is merely the agency's litigating position in the particular matter].) But the record shows the DSS had adopted its interpretation before the Respondents filed their administrative appeals and before they filed this lawsuit.[8]

---

having "entered the United States" before that date, he or she must have not only (1) physically entered before that date, but also (2) been continuously present here from the latest date of entry before August 22, 1996, until the date he or she obtained qualified alien status. (62 Fed.Reg. 61344, 61415.) Thus, in addressing this policy concern, not even that regulation was based on a plain language interpretation of entry.

[8] We are not persuaded by Respondents' legislative history arguments. First, Respondents note that, as originally adopted, section 18938 referred to immigrants who "*legally* entered the United States on or after August 22, 1996." (Stats. 1998, ch. 329, § 38, italics added.) In 1999, the Legislature deleted the word "legally." (Stats. 1999, ch. 147, § 42.7.) Respondents assert, without any additional evidence, that this deletion shows the Legislature sought to clarify in 1999 that it meant physical arrival without regard to the person's immigration status on that date. This is speculation. In fact, deletion of "legally" could cut in favor of the DSS's interpretation. Under the DSS interpretation based on the effective date of the immigrant's current immigration status, use of the word "legally" in section 18938 would be unnecessary and redundant; under the CAPI statutes, only legal immigrants are eligible for benefits. (§§ 18937, 18938.)

Second, Respondents rely on a floor analysis of a bill extending CAPI benefits to post-August 22, 1996 entrants, which states the legislation was intended to assist "legal noncitizens who *arrived* in the United States on or after August 22, 1996." (Assem. Floor Analysis of Assem. Bill No. 1111 (1999–2000 Reg. Sess.), as amended June 15, 1999, p. 4, ¶ 22 (June 1999), italics added [as of June 20, 2005].) The DSS points out that this one-sentence description of section 18938 is the only place "arrived" appears in a bill analysis of that statute, that there is no accompanying substantive analysis whatsoever, and there is no indication this description was drafted by a member of the Legislature. Moreover, if the Legislature intended this meaning, it could have used the word "arrived" instead of "entered" in section 18938, just as it did so in section 18940.

Lastly, Respondents point out that the DSS proposed a bill to amend section 18938 to define "entered the United States" precisely the way the DSS construes the phrase in its regulation. The DSS introduced the bill after the trial court's decision in this case and for the purpose of overturning that decision. The bill was defeated in committee in April 2004. (Assem. Bill No. 2667 (2003–2004 Reg. Sess.) <http://www.sen.ca.gov> [as of June 20, 2005].) However, Respondents acknowledge that, in general, unpassed bills provide "very limited guidance" in discerning legislative intent. (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 735 fn. 7 [180 Cal.Rptr. 496, 640 P.2d 115].) It would be pure speculation to decipher a legislative intent based solely on this evidence.

## DISPOSITION

The judgment is reversed and the writ of mandate is vacated. The trial court is directed to enter a new and different judgment denying the writ.

Corrigan, Acting P. J., and Pollak, J., concurred.