BILL LOCKYER Attorney General GREGORY L. GONOT Deputy Attorney General
THE HONORABLE CHARLES J. McKEE, COUNTY COUNSEL, COUNTY OF MONTEREY, AND THE HONORABLE DEAN FLIPPO, DISTRICT ATTORNEY, COUNTY OF MONTEREY, have requested an opinion on the following question:
Does the Mental Health Services Act authorize the funding of the costs of customary court staff operating a local mental health court, including the salaries of judges, commissioners, court clerks, deputy district attorneys, and deputy public defenders, pursuant to a locally developed and approved county mental health plan?
 CONCLUSION
The Mental Health Services Act does not authorize the funding of the costs of customary court staff operating a local mental health court, including the salaries of judges, commissioners, court clerks, deputy district attorneys, and deputy public defenders, pursuant to a locally developed and approved county mental health plan.
 ANALYSIS
At the November 2, 2004, General Election, California voters approved an initiative measure, Proposition 63, which enacted the Mental Health Services Act (adding Welf. Inst. Code, §§ 5771.1,5813.5, 5820-5822, 5830, 5840-5840.2, 5845-5848, 5878.15878.3, 5890-5898, 18257; amending Rev. Tax. Code, § 19602; and adding Rev. Tax. Code, §§ 17043, 19602.5; "Act").[1] The Act imposes an income tax surcharge of 1 percent on taxpayers with annual taxable incomes in excess of $1 million. Revenues from the tax are deposited in the Mental Health Services Fund (§§ 5890-5898; "Fund") for use in expanding the delivery of mental health services.
We are informed that a county proposes to use Fund revenues to operate a mental health court for defendants with mental illnesses. The defendants would participate in court-supervised treatment in lieu of typical criminal sanctions. The question presented for analysis concerns whether the county will be able to use Fund revenues to pay for the costs of customary court staff in operating the mental health court. We conclude that Fund revenues may not be so used.
Preliminarily, we note that the Fund is administered by the State Department of Mental Health ("Department"), which is charged with adopting regulations to implement the Act's provisions. (§§ 5890, 5898.) Local mental health programs are operated by counties pursuant to three-year plans, updated annually, that are approved by the Department. (§ 5847, subd. (a).)
The Act neither expressly authorizes nor expressly prohibits the use of Fund revenues to operate a mental health court. Section 5891 provides generally:
 "The funding established pursuant to this act shall be utilized to expand mental health services. These funds shall not be used to supplant existing state or county funds utilized to provide mental health services. The state shall continue to provide financial support for mental health programs with not less than the same entitlements, amounts of allocations from the General Fund and formula distributions of dedicated funds as provided in the last fiscal year which ended prior to the effective date of this act. The state shall not make any change to the structure of financing mental health services, which increases a county's share of costs or financial risk for mental health services unless the state includes adequate funding to fully compensate for such increased costs or financial risk. These funds shall only be used to pay for the programs authorized in Section 5892. These funds may not be used to pay for any other program. These funds may not be loaned to the state General Fund or any other fund of the state, or a county general fund or any other county fund for any purpose other than those authorized by Section 5892." (Italics added.)
Section 5892, subdivision (a)(5), authorizes the use of Fund revenues "for services to persons with severe mental illnesses . . ., for the children's system of care . . ., [and] for the adult and older adult system of care." (§ 5892, subd. (a)(5).)
In construing the language of section 5891, we rely upon well-settled rules of statutory interpretation. When the language has been adopted pursuant to an initiative measure approved by the voters, "[a]bsent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure." (Lesher Communications, Inc. v. City of Walnut Creek
(1990) 52 Cal.3d 531, 543.) We give the words their ordinary meaning, construing the language in the context of the overall statutory scheme, and look to the ballot pamphlet if the language is ambiguous. (See Robert L. v. Superior Court (2003)30 Cal.4th 894, 900-901; Lungren v. Deukmejian (1998)45 Cal.3d 727, 735; In re Lance W. (1985) 37 Cal.3d 873, 889; White v.Davis (2002) 108 Cal.App.4th 197, 211.)
Applying these rules of construction, we find that the court personnel in question would not themselves be performing "mental health services"; rather, other agencies and entities would perform mental health services and treatment programs. The criminal justice system would be a beneficiary of the mental health services provided by these other agencies, as explained in the ballot pamphlet describing the purposes of Proposition 63:
 "Our prisons and jails are full of thousands of people with mental illness who would not be there if they had been offered treatment. We should provide care before people end up on the streets, or behind bars. Then our police officers can focus on criminals, instead of people who are ill and need help." (Ballot Pamp., Gen. Elec. (Nov. 2, 2004) argument in favor of Prop. 63, p. 36.)
Consistent with this language from the ballot pamphlet is the Legislature's declaration of policies for furnishing resources to expand mental health services:
 "The Legislature finds and declares all of the following:
 "(a) Recent estimates indicate that there are 50,000 homeless severely mentally ill Californians, including 10,000 to 20,000 homeless mentally ill veterans.
 "(b) When people who suffer from severe mental illness do not have access to the services they require they frequently enter the criminal justice system. However, those who receive extensive community treatment are much less frequently incarcerated. The Department of Corrections is expending $400 million annually for the incarceration and treatment of people suffering from severe mental illness. In addition, the Department of Corrections and the criminal justice system are responsible for the placement of more than 3,000 of the total of approximately 4,500 persons in the state mental hospitals, for an additional annual state cost of over $300 million.
 "(c) Increasing funding for an adult mental health system of care will result in significantly reduced Department of Corrections, criminal justice system, and local law enforcement expenditures for people with severe mental illness." (Stats. 1999, ch. 617, § 1.)
Providing additional mental health services will reduce the costs of the criminal court system by reducing the need for court intervention.
That judges, commissioners, court staff, deputy district attorneys, and deputy public defenders do not themselves furnish "mental health services" is reflected in section 5814, subdivision (f)(2):
 "The funding provided pursuant to this part shall be sufficient to provide mental health services, medically necessary medications to treat severe mental illnesses, alcohol and drug services, transportation, supportive housing and other housing assistance, vocational rehabilitation and supported employment services, money management assistance for accessing other health care and obtaining federal income and housing support, accessing veterans' services, stipends, and other incentives to attract and retain sufficient numbers of qualified professionals as necessary to provide the necessary levels of these services. These grants shall, however, pay for only that portion of the costs of those services not otherwise provided by federal funds or other state funds."
Similarly, subdivision (d)(4) of section 5802 describes the services to be expanded by the use of Fund revenues:
 "Provide funds for counties to establish outreach programs and to provide mental health services and related medications, substance abuse services, supportive housing or other housing assistance, vocational rehabilitation, and other nonmedical programs necessary to stabilize homeless mentally ill persons or mentally ill persons at risk of being homeless, get them off the street, and into treatment and recovery, or to provide access to veterans' services that will also provide for treatment and recovery."
Moreover, while a county's mental health court would undoubtedly play an important role in support of its mental health system of care, the county would be subject to the requirement that "funding shall only cover the portions of those costs of services that cannot be paid for with other funds including other . . . local, state and federal funds." (§ 5813.5, subd. (b).) Budgets for judicial and law enforcement functions, including the salaries of judges, prosecutors, and public defenders, are not decreased due to the mental condition of the defendants. The state and local funding of the judicial system would continue to be available to cover the costs of the customary court staff of a mental health court.
Our interpretation of the Act's requirements is supported by the Department's consistent administrative interpretation of the Act's provisions. With specific regard to the use of Fund revenues to pay for the costs of operating a mental health court, the Department has declared:
 ". . . Mental health courts involve customary court staff as well as additional mental health staff. The costs of customary court staff and procedures, such as the judge, the attorneys, the bailiff, etc. are not allowable [Act] costs. Mental health clinicians and case managers who provide and monitor the defendant's treatment are allowable costs for new or expanded services. Some mental health courts also employ a court coordinator or court administrator who functions as a liaison between the court and the mental health system. This position may include both court functions, and mental health functions such as screening and/or case management. If so, the new or expanded costs attributable to the mental health functions would be an allowable [Act] cost. If there are other positions or costs with blended functions, the new or expanded costs should be allocated, with [Act] funds being used for mental health functions only." (Cal. Dept. of Mental Health, Frequently Asked Questions, Community Services and Supports Component (Dec. 13, 2005) pp. 1-2.)
"Unless unreasonable, the consistent construction of a statute by an agency charged with responsibility for its implementation is entitled to great deference. [Citation.]" (Dix v. SuperiorCourt (1991) 53 Cal.3d 442, 460; see In re Dannenberg (2005)34 Cal.4th 1061, 1082; Sharon G. v. Superior Court (2003)31 Cal.4th 417, 436; Yamaha Corp. of America v. State Bd. ofEqualization (1998) 19 Cal.4th 1, 12; Megrabian v. Saenz
(2005) 130 Cal.App.4th 468, 484-486; Spanish Speaking Citizens'Foundation, Inc. v. Low (2000) 85 Cal.App.4th 1179, 1215.) We find the Department's implementation of the Act's provisions to be reasonable and consistent with the Act's language and purposes.
We conclude that the Act does not authorize the funding of the costs of customary court staff operating a local mental health court, including the salaries of judges, commissioners, court clerks, deputy district attorneys, and deputy public defenders, pursuant to a locally developed and approved mental health plan.
[1] All references hereafter to the Welfare and Institutions Code are by section number only.