[No. B200788. Second Dist., Div. Two. Sept. 16, 2008.]

In re SOCIAL SERVICES PAYMENT CASES.

1250

**COUNSEL**

Arias Ozzello & Gignac, Mike Arias, J. Paul Gignac, Mikael H. Stahle and H. Scott Leviant for Plaintiffs and Appellants Jasmine B. et al.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Richard T. Waldow and Gregory M. Cribbs, Deputy Attorneys General, for Defendants and Respondents the California Department of Social Services et al.

**OPINION**

**DOI TODD, J.**—Plaintiffs and appellants, a proposed class of individuals representing developmentally disabled foster children and their foster families throughout California, appeal from a judgment entered following the trial court's order sustaining a demurrer without leave to amend filed by defendants and respondents the State Department of Social Services and its director, John A. Wagner (collectively the DSS). Appellants sought reimbursement of additional foster care benefits allegedly available for the children. The trial court ruled that appellants failed to state a claim, as the additional rates are available only to facilities that have been "vendorized," or approved to

provide the services and supports a developmentally disabled child has been assessed to need, and appellants failed to allege they could meet this requirement.

■ We affirm. The language of the statutory and regulatory scheme governing developmentally disabled foster children and the policy considerations underlying that scheme require that the facilities into which developmentally disabled foster children are placed be vendorized in order to receive the additional rates referenced in Welfare and Institutions Code sections 4684 and 11464.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In reviewing a trial court's order sustaining a demurrer, we assume the truth of all facts properly pleaded in the complaint, but we do not assume the truth of contentions, deductions or conclusions of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479]; *Fleming v. State of California* (1995) 34 Cal.App.4th 1378, 1381 [41 Cal.Rptr.2d 63].)

*The Statutory Scheme.*

Appellants' allegations are premised on the applicable statutory and regulatory scheme governing the public benefits provided to foster children with developmental disabilities. California provides foster care benefits to eligible children under a program funded by the state and federal governments. Title IV-E of the Social Security Act, title 42 United States Code section 601 et seq., authorizes the Aid to Families with Dependent Children-Foster Care (AFDC-FC) program. (See generally *State of Cal. Dept. of Social Servs. v. Thompson* (9th Cir. 2003) 321 F.3d 835, 839.) The federal government's contribution of funds is dependent on the state's implementation of and compliance with a "State plan" that meets the requirements of federal law. (42 U.S.C. §§ 671, 672; 45 C.F.R. §§ 1355.21, 1356 et seq. (2007).)

One requisite element of the state plan is the designation of a "single State agency with authority to administer or supervise the administration of the plan." (45 C.F.R. § 205.100(a)(1)(i) (2007); see also 45 C.F.R. § 1355.30(p)(4) (2007).) The designated single state agency must have authority to make rules and regulations governing the administration of the plan and may not delegate its authority to exercise discretion in the administration and supervision of the plan. (45 C.F.R. § 205.100(a)(1)(ii), (b)(1).) Though other state

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

and local agencies may perform services for the single state agency, they do "not have authority to review, change, or disapprove any administrative decision of the single State agency, or otherwise substitute their judgment for that of the agency as to the application of policies, rules, and regulations promulgated by the State agency." (45 C.F.R. § 205.100(b)(3).)

Having elected to participate in the AFDC-FC program, California has submitted a state plan and enacted a statutory scheme designed to comply with the federal requirements. (See § 10000 et seq.; see also *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 738–739 [97 Cal.Rptr. 385, 488 P.2d 953].) Under the state plan, the DSS is designated as the "single state agency with full power to supervise every phase of the administration of public social services . . . ." (§ 10600.) Such services include the provision of foster care. (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 143 [32 Cal.Rptr.2d 643].) Accordingly, the DSS is also charged with the authority to make "rules and regulations for the proper maintenance and care of needy children and for the administration of Aid to Families with Dependent Children." (§ 11209.)

The Legislature has determined that the provision of public social services, including foster care, is a county function and responsibility subject to any applicable state and federal statutes and regulations. (§ 10800.) Counties are responsible for a public system of statewide child welfare services, which includes providing for the investigation of possible abuse or neglect of a child warranting removal from parental custody. (§§ 300 et seq., 16500 et seq.) A child removed from his or her home pursuant to the dependency statutes and placed in foster care becomes eligible to receive AFDC-FC benefits. (§§ 11400, subd. (a), 11401, 11460.) According to section 11404, subdivision (a), "a child is not eligible for AFDC-FC unless responsibility for placement and care of the child is with the county welfare department . . . ." Eligibility for AFDC-FC is also dependent on the agency with the responsibility for the child's placement and care developing a case plan for the child, defined in pertinent part as a "written document that, at a minimum, specifies the type of home in which the child shall be placed, the safety of that home, and the appropriateness of that home to meet the child's needs. It shall also include the agency's plan for ensuring that the child receive proper care and protection in a safe environment, and shall set forth the appropriate services to be provided to the child, the child's family, and the foster parents, in order to meet the child's needs while in foster care, and to reunify the child with the child's family." (§ 11400, subd. (b); see § 11404, subd. (b).)

"Foster care providers shall be paid a per child per month rate in return for the care and supervision of the AFDC-FC child placed with them." (§ 11460, subd. (a).) Section 11460 further defines "care and supervision" to include

"food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." (§ 11460, subd. (b).) The DSS has the duty to administer a state system for establishing rates for the AFDC-FC program. (§ 11460, subd. (a).) The basic foster care rates are described by statute, including sections 11461 (licensed or approved family homes), 11462 (group homes and public child care institutions) and 11463 (foster family agencies).

■ The State Department of Developmental Services (DDS) is responsible for the execution of laws and the establishment of rules and regulations relating to the care, custody and treatment of developmentally disabled persons. (§§ 4416, 4417.) The Lanterman Developmental Disabilities Services Act (Lanterman Act; § 4500 et seq.), contains provisions affording assistance to developmentally disabled individuals; such services are governed by a separate state plan. (§§ 4561–4568, 4675.) For purposes of the Lanterman Act, a developmental disability is one that originates before an individual is 18 years old, continues or can be expected to continue indefinitely, constitutes a substantial disability, and includes "mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, but shall not include other handicapping conditions that are solely physical in nature." (§ 4512, subd. (a); see also Cal. Code Regs., tit. 17, § 54000, subds. (a), (b).)

■ A county social worker may refer a foster child believed to have developmental disabilities to a "regional center" for evaluation. Established by the Lanterman Act, regional centers are private, nonprofit corporations that contract with the DDS to help the state carry out its responsibilities to developmentally disabled persons and their families. (§§ 4620–4622, 4629.) To be eligible for regional center services, an individual must have a developmental disability that falls within the definition provided by section 4512, subdivision (a). (§§ 4643, subd. (b), 4643.5; Cal. Code Regs., tit. 17, § 54010, subd. (b).) Regional centers develop individual program plans for eligible individuals that are designed to address identified goals and objectives through the provision of specified services and supports. (§§ 4646, 4646.5, 4648.)

As directed by statute, the DDS has "adopt[ed] regulations that specify rates for community care facilities serving persons with developmental disabilities." (§ 4681.1, subd. (a).) According to the regulations, a " '[f]acility' means a licensed community care facility as defined in Health and Safety Code Section 1502(a)(1), (4), (5) or (6) . . . , which has been vendorized as a residential facility by a regional center . . . ." (Cal. Code Regs., tit. 17,

§ 56002, subd. (a)(15); see also Cal. Code Regs., tit. 17, § 54302, subd. (a)(55).)[2] Vendorization "is the process for identification, selection, and utilization of service vendors or contractors, based on the qualifications and other requirements necessary in order to provide the service." (§ 4648, subd. (a)(3)(A); see also Cal. Code Regs., tit. 17, § 54302, subd. (a)(78) [" 'Vendorization' means the process used to: [¶] (A) Verify that an applicant meets all of the requirements and standards pursuant to Section 54320(b) of these regulations prior to the provision of services to consumers; and [¶] (B) Assign vendor identification numbers, service codes and subcodes, for the purpose of identifying vendor expenditures"].)

■ The facility rates specified in section 4681.1 are referred to as "ARM rates" because they are premised on the model identified in the DDS's April 1987 report entitled "Alternative Residential Model." (See former § 4681.1, subd. (c), added by Stats. 1988, ch. 85, § 2, p. 384, eff. Apr. 22, 1988.) The ARM rates correspond to a facility's service level. (Cal. Code Regs., tit. 17, §§ 56902, 56910–56915.) A facility's " '[s]ervice [l]evel' means one of a series of 4 levels which has been approved for each facility by a regional center. Service Levels 2, 3 and 4 have a specified set of requirements that a facility must meet which addresses the direct supervision and special services for consumers within that facility." (Cal. Code Regs., tit. 17, § 56002, subd. (a)(44).) Service level 1 through 4 facilities must possess a valid community care facility license issued by the DSS and "shall be vendorized by a regional center pursuant to the requirements of Title 17, California Code of Regulations, Chapter 3, Subchapter 2." (Cal. Code Regs., tit. 17, § 56004, subds. (a), (b).)

■ A foster child who is eligible to receive regional center services is commonly referred to as a "dual agency child." Section 4684 addresses funding for out-of-home nonmedical care and supervision of dual agency children and, prior to its 2007 amendments, provided: "Notwithstanding any other provision of law, the cost of providing 24-hour out-of-home nonmedical care and supervision in licensed community care facilities shall be funded by the Aid to Families with Dependent Children-Foster Care (AFDC-FC) program pursuant to Section 11464, for children who are both AFDC-FC recipients and regional center clients. [¶] Regional centers shall pay the cost of services which they authorize for AFDC-FC recipients but which are not allowable under state or federal AFDC-FC program requirements. Regional centers shall accept referrals for evaluations of AFDC-FC eligible children

---

[2] A " '[c]ommunity care facility' means any facility, place, or building that is maintained and operated to provide nonmedical residential care, day treatment, adult day care, or foster family agency services for children, adults, or children and adults, including, but not limited to, the physically handicapped, mentally impaired, incompetent persons, and abused or neglected children, and includes" a residential facility, foster family agency, foster family home and small family home. (Health & Saf. Code, § 1502, subd. (a)(1), (4), (5), (6).)

and assist county welfare and probation departments in identifying appropriate placement resources for children who are eligible for regional center services."[3]

In turn, prior to its repeal in 2007, former section 11464 addressed the rates for dual agency children, stating: "Notwithstanding any other provision of law, the State Department of Social Services shall use the residential facility rates established by the State Department of Developmental Services to determine rates to be paid for 24-hour out-of-home nonmedical care and supervision of children who are both regional center clients pursuant to Section 4684 and AFDC-FC recipients under the provisions of this chapter and placed in licensed community care facilities. [¶] Any services authorized by a regional center for AFDC-FC recipients that are not allowable under state or federal AFDC-FC program requirements shall be paid pursuant to Section 4684."

*The Trial Court Proceedings.*

Appellants are an uncertified class comprised of current and former foster children and their foster families who contend that they were entitled to receive additional benefits in the form of payment of the ARM rates because of the children's developmental disabilities. Appellants fall into one of three subclasses: (1) dual agency children under age 18 who at any time since 1987 were placed in licensed community care facilities that did not receive the ARM rates; (2) dual agency children over age 18 who were placed in licensed community care facilities that did not receive the ARM rates at any point within the applicable limitations period; and (3) persons who were foster parents of the children identified within the foregoing groups at any point within the applicable limitations period.

In 2005, appellants filed approximately 10 identical class action lawsuits in various counties throughout California, alleging an underpayment of foster care benefits to dual agency children. They contended the statutory scheme did not require a licensed community care facility into which a dual agency child had been placed to be vendorized by a regional center in order to receive the ARM rates. The Judicial Council of California coordinated the actions pursuant to California Rules of Court, rule 3.550, assigning a single judge, the caption "Social Services Payment Cases" and case

---

[3] Section 4684 was amended and section 11464 was repealed and reenacted in 2007 to provide specified rates for care and supervision provided to dual agency children in nonvendorized placements and to unambiguously establish the requirement of vendorization for a facility seeking receipt of the ARM rates. (See §§ 4684, 11464, amended by Stats. 2007, ch. 177, eff. Aug. 24, 2007.) Appellants' claims are based on the prior versions of the statutes and are not affected by the amendment or repeal.

number JCCP No. 4439. In March 2006, the trial court sustained a demurrer with leave to amend brought by nine California counties (Counties) in the coordinated action. The trial court directed appellants to combine the coordinated actions into a single complaint and to plead more specifically the applicable statutory and regulatory schemes.

In April 2006, appellants filed their master complaint against the DSS and its director, and the Counties, including Los Angeles County (County). They alleged causes of action for underpayment of social services, declaratory relief, injunctive relief and writ of mandate on the ground that the DSS had improperly denied payment of the ARM rates to licensed community care facilities providing nonmedical care and supervision for dual agency children. The DSS demurred, as did the Counties. The County also filed a supplemental demurrer in which several other Counties joined. They argued that the applicable statutes and regulations, when read together, demonstrated vendorization was a prerequisite for a licensed community care facility's receipt of the ARM rates and that, therefore, nonvendorized facilities were ineligible to receive the ARM rates.

Appellants opposed, asserting that no statute or regulation required that the ARM rates be paid only to a vendorized provider and that imposing such a requirement improperly delegated placement authority to the regional centers in violation of the "single state agency" rule.

Following an August 2006 hearing, the trial court filed an order on November 1, 2006, which sustained the demurrers with leave to amend as to the DSS and without leave to amend as to the Counties. It ruled: "Just as foster parents and foster homes must be licensed in order to receive AFDC-FC benefits, state regulations require foster parents and foster homes to be 'vendorized' in order to receive the additional benefits for care of developmentally disabled children authorized by Welfare and Institutions Code sections 4684 and 11464. These regulations are not contrary to statute and must be given deference by the court." Finding ambiguity in the statutory scheme as to whether a licensed community care facility, including an individual foster home, must be vendorized in order to qualify for receipt of the ARM rates, the trial court turned to agency regulations for guidance and reasoned that the applicable regulations supported a vendorization requirement. It further found that its interpretation of the statutory scheme did not violate the single state agency rule, as the vendorization requirement did not interfere with a county's placement decisions. With respect to the Counties, the trial court concluded they were not proper parties to the litigation because their administration of foster care benefits depended on a delegation from the DSS and they were not permitted to act independently of or contrary to the DSS's instructions. With respect to the DSS, the trial court granted

appellants leave to amend to allow claims to be brought by "dual agency children who have been placed in vendorized licensed community care facilities."

Thereafter, in January 2007 appellants filed a first amended master complaint (FAMC). Appellants did not comply with the trial court's prior order by alleging more limited claims or alleging claims on behalf of a more limited group of caregivers. Rather, they continued to challenge the vendorization requirement through allegations such as: "Interpreting sections 4684 and 11464 of the Welfare and Institutions Code to mean that a regional center must approve a county's placement decision before a given rate of AFDC-FC funding can be paid to a dual agency child would be inconsistent with the Legislature's intent to comply with federal funding requirements"; "[r]equiring regional centers to approve or disapprove foster care providers or the eligibility for benefits (through vendorization) would be inconsistent with the requirement that a 'single state agency' be in charge of foster care"; and "[n]o California statute or regulation expressly states that a licensed community care facility in which a dual agency child has been placed must be vendorized before the foster care rate specified in Welfare and Institutions Code section 11464 can be paid on behalf of the child." Their only new allegation was that the DSS had acted inconsistently with its current interpretation of the vendorization requirement by placing "hundreds of dual agency children" in nonvendorized placements, paying the ARM rates to numerous dual agency children in those placements, and failing to notify other dual agency children in those placements of the availability of the ARM rates. Appellants sought payment of rates equal to the ARM rates for care and supervision provided by licensed community care facilities to dual agency children since July 1987.

The DSS again demurred. It asserted that appellants were not entitled to any relief as a matter of law because they failed to allege they were placed in or operated a licensed community care facility that was vendorized by or contracted with a regional center. For the most part, its arguments mirrored the bases for the trial court's previous order sustaining the demurrer. In support of its demurrer, the DSS requested the trial court to take judicial notice of two "all county letters," as well as the memorandum of points and authorities filed by the Counties in support of the previous demurrer. The DSS issued All County Letter No. 87-64 (ACL 87-64) on April 30, 1987, "to provide further information and instructions to counties regarding the implementation of AB 2520 (Chapter 355, Statutes of 1986)." Under the heading "Eligible Population and Eligible Facilities," ACL 87-64 provided: "All AFDC-FC recipients who are also receiving services as regional center clients shall be eligible for the rate of payment established by SDDS for 24-hour out-of-home nonmedical care and supervision. The majority of regional center placements are made into facilities of the small family home category,

however, regional center placements may also be made into licensed foster family homes and group homes. The provisions of this statute apply to AFDC-FC children placed in any of these facilities having a 'vendorized' or contractual relationship with the regional centers." The DSS issued All County Letter No. 98-28 (ACL 98-28) over 10 years later, superseding ACL 87-64. The purpose of ACL 98-28 was "to inform counties of federal and state requirements regarding funding for foster children who are regional center clients." It discussed the rate system that had been implemented since the issuance of ACL 87-64, explaining: "Effective January 1, 1991 the CDDS implemented the Alternative Residential Model (ARM) for setting rates to cover the cost of care and supervision for regional center clients, including dual agency children. The ARM rates are based on the level of services provided by a facility. The regional center 'vendorizes' each licensed facility and approves a facility service level, which then corresponds to an established facility rate." ACL 98-28 further reiterated that "[t]he provisions of WIC Section 11464 apply to AFDC-FC children placed in any of these licensed facilities having a 'vendorized' or contractual relationship with the regional centers." The DSS argued that its interpretation of the applicable statutes promulgated in the All County Letters should control over any anecdotal conduct to the contrary.

This time, the trial court sustained the demurrer without leave to amend. To the extent the FAMC reiterated the allegations in the master complaint that were previously found to be deficient, the trial court adopted the reasoning of its prior order sustaining the DSS's demurrer. Assuming the truth of the new allegations that the DSS had previously not enforced the vendorization requirement, the trial court found that those allegations did not undermine the DSS's reliance on its policy requiring vendorization nor did they create any basis for an estoppel to deny the policy.

The trial court thereafter entered judgment in favor of the DSS and this appeal followed.[4]

## DISCUSSION

Appellants maintain that the trial court erred in sustaining the DSS's demurrer without leave to amend, asserting that the trial court's reasoning finds no support in the statutory scheme. They contend that the imposition of a vendorization requirement violates the single state agency rule by improperly delegating authority to the regional centers, that the provisions of the

---

[4] Although the appeal was taken from the nonappealable order sustaining the demurrer, we treat the notice of appeal as a premature but valid notice of appeal from the subsequently entered judgment. (See Cal. Rules of Court, rule 8.104(e)(2).)

Lanterman Act have no application to dual agency children, and that the trial court improperly relied on the All County Letters to interpret the relevant statutes. Alternatively, they assert the DSS is estopped to deny payment of the ARM rates to nonvendorized licensed community care facilities.

I. *Standard of Review.*

A demurrer tests the legal sufficiency of the complaint. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497 [57 Cal.Rptr.2d 406].) On appeal from a judgment of dismissal following an order sustaining a demurrer, we examine the complaint de novo in order to ascertain "whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We assume the truth of the properly pleaded factual allegations, facts that can be reasonably inferred from those pleaded, and facts of which judicial notice can be taken. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) But we do not assume the truth of pleaded contentions and legal conclusions. (*Moore v. Regents of University of California, supra,* 51 Cal.3d at p. 125; *Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1120 [66 Cal.Rptr.2d 337].) And we may disregard allegations which are contrary to law or to a fact of which judicial notice may be taken. (*Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 559–560 [53 Cal.Rptr.2d 878].)

We review the trial court's denial of leave to amend for an abuse of discretion. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; *Hernandez v. City of Pomona, supra,* 49 Cal.App.4th at pp. 1497–1498.) "When a demurrer is sustained without leave to amend, we determine whether there is a reasonable probability that the defect can be cured by amendment. [Citation.]" (*V.C. v. Los Angeles Unified School Dist.* (2006) 139 Cal.App.4th 499, 506 [43 Cal.Rptr.3d 103].) Appellants bear the burden of demonstrating the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend. (*Blank v. Kirwan, supra,* at p. 318; *V.C. v. Los Angeles Unified School Dist., supra,* at pp. 506–507.)

II. *The Trial Court Properly Sustained the Demurrer Without Leave to Amend.*

The trial court's order sustaining the DSS's demurrer without leave to amend incorporated the reasoning of its prior order sustaining the demurrer

with leave to amend. In the prior order, the trial court found the language of section 11464 ambiguous to the extent the statute did not include an express vendorization requirement. In view of this ambiguity, the trial court examined the statutory scheme as a whole, regulations enacted by the DDS relating to the establishment of ARM rates and the DSS's and the DDS's past practices to determine that licensed community care facilities must be vendorized by a regional center to be eligible to receive the ARM rates established by the DDS. We see no basis to disturb the trial court's interpretation of section 11464.

### A. Statutory Interpretation Principles.

██ The objective of statutory interpretation is to ascertain and effectuate the intent of the Legislature. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641].) The first step in determining legislative intent is to analyze the statutory language, giving the words of the statute a plain and commonsense meaning. (*Ibid.*) If the statutory language is unambiguous, a court must presume that the Legislature meant what it said, and the plain meaning of the statute governs. (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].) Nonetheless, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

██ "When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction 'which serve as aids in the sense that they express familiar insights about conventional language usage.' [Citation.]" (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166].) Accordingly, "when the statutory language is ambiguous and susceptible to more than one reasonable interpretation, 'we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].)" (*Forrest v. Department of Corporations* (2007) 150 Cal.App.4th 183, 205 [58 Cal.Rptr.3d 466].) The court may also consider the impact of an interpretation on public policy, for "[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation."

(*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

B. *The Statutory Scheme Governing Dual Agency Children Must Be Construed to Require Vendorization for a Licensed Community Care Facility to Receive the ARM Rates.*

Separate parts of the Welfare and Institutions Code address services for the developmentally disabled (§ 4500 et seq.) and the provision of AFDC-FC (§ 11400 et seq.). One statute in each of those sections intersects with and cross-references the other to address payment for services provided to developmentally disabled foster children. Former section 4684 provided that "the cost of providing 24-hour out-of-home nonmedical care and supervision in licensed community care facilities shall be funded by the Aid to Families with Dependent Children-Foster Care (AFDC-FC) program pursuant to Section 11464, for children who are both AFDC-FC recipients and regional center clients." Former section 11464 required that "the State Department of Social Services shall use the residential facility rates established by the State Department of Developmental Services to determine rates to be paid for 24-hour out-of-home nonmedical care and supervision of children who are both regional center clients pursuant to Section 4684 and AFDC-FC recipients under the provisions of this chapter and placed in licensed community care facilities." To the extent that a regional center authorizes services for a dual agency child that are not payable by AFDC-FC, the regional centers are responsible to pay the cost of those services. (§ 4684.) Both provisions applied "[n]otwithstanding any other provision of law . . . ." (Former §§ 4684, 11464.)

■ The question before us is whether a licensed community care facility's receipt of the ARM rates specified in section 11464 is contingent upon a regional center vendorizing the facility, notwithstanding that payment for "care and supervision" is funded through the AFDC-FC program as opposed to the regional centers. To answer this question, we are guided by *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778–779 [38 Cal.Rptr.2d 699, 889 P.2d 1019], where the court declared: "When two statutes touch upon a common subject, they are to be construed in reference to each other, so as to 'harmonize the two in such a way that no part of either becomes surplusage.' [Citations.] Two codes ' "must be read together and so construed as to give effect, when possible, to all the provisions thereof." ' [Citation.]" (Accord, *Mejia v. Reed, supra*, 31 Cal.4th at p. 663.) ■ Harmonizing the text of section 4684 and section 11464 so that each word has significance, we must conclude that in order for the DSS to "use the residential facility rates established by" the DDS to determine the rates to be paid for the care of dual agency children placed in licensed community care facilities (former

§ 11464), the DSS must take into account the statutory and regulatory conditions which are critical components of the ARM rates.

■ Dual agency children fall within the Lanterman Act; they are defined as "regional center clients," which means they have been determined to suffer from a developmental disability that makes them eligible for regional center services. (§§ 4643, subd. (b), 4643.5, 4684, 11464; Cal. Code Regs., tit. 17, §§ 54000, subd. (a), 54010, subd. (b).) Under the Lanterman Act, the state has accepted responsibility for these individuals, declaring that it has an obligation to provide an "array of services and supports . . . to meet the needs and choices" of the developmentally disabled. (§ 4501.) To fulfill the state's obligation, the Legislature has directed the regional centers to conduct a number of specified activities for the developmentally disabled—primary among those is "[s]ecuring needed services and supports." (§ 4648, subd. (a).) In order to "secure services and supports that meet the needs of the consumer, as determined in the consumer's individual program plan," a regional center may purchase services "pursuant to vendorization or a contract . . . ." (§ 4648, subd. (a)(1), (3); see also *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 490 [20 Cal.Rptr.3d 890, 100 P.3d 433] [holding that regional centers have no obligation to provide services themselves, noting that "the only choice facing regional centers, except in emergencies, is which vendor to hire, not whether to hire a vendor at all"].) As outlined in section 4648, subdivision (a)(3)(A), "[v]endorization or contracting is the process for identification, selection, and utilization of service vendors or contractors, based on the qualifications and other requirements necessary in order to provide the service."

With respect to payment for services and supports provided to individuals in out-of-home placements, the Legislature's expressed goal was to develop a payment system consistent with its obligation to meet the needs of the developmentally disabled: "In order to assure the availability of a continuum of community living facilities of good quality for persons with developmental disabilities, and to ensure that persons placed out of home are in the most appropriate, least restrictive living arrangement, the department shall establish and maintain an equitable system of payment to providers of such services. The system of payment shall include provision for a rate to ensure that the provider can meet the special needs of persons with developmental disabilities and provide quality programs required by this article." (§ 4680; see also § 4648, subd. (a)(5).)

■ By statute, rates for licensed community care facilities serving persons with a developmental disability—the ARM rates—are "calculated on the basis of a cost model designed by the [DDS] which ensures that aggregate facility payments support the provision of services to each person in accordance with his or her individual program plan and applicable program

requirements." (§ 4681.1, subd. (a).) The cost model is designed to reflect a number of elements including, but not limited to, basic living needs, direct care, special services, indirect costs and property costs. (§ 4681.1, subds. (a)–(c).) Also by statute, the Legislature directed the DDS to prepare regulations to implement the community care facility rates in accordance with the cost model. (§ 4681.1, subd. (e).)

The statutorily mandated regulations unambiguously make vendorization an inextricable element of the cost model. California Code of Regulations, title 17, section 56001 et seq. describes the facility service levels and approval process for a licensed community care facility to provide services at the specified 1 through 4 levels. According to California Code of Regulations, title 17, section 56004, subdivision (b): "Service Level 1 through 4 facilities shall be vendorized by a regional center pursuant to the requirements of Title 17, California Code of Regulations, Chapter 3, Subchapter 2." (See also Cal. Code Regs., tit. 17, § 56001 ["Use of the word 'shall' denotes mandatory conduct . . . ."].) The regulations provide a " '[f]acility' means a licensed community care facility as defined in Health and Safety Code Section 1502(a)(1), (4), (5) or (6) . . . which has been vendorized as a residential facility by a regional center pursuant to the requirements of Title 17, California Code of Regulations, Division 2, Chapter 3, Subchapter 2." (Cal. Code Regs., tit. 17, § 56002, subd. (a)(15).) Likewise, a "residential service provider" is defined as "an individual or entity which has been licensed by the Department of Social Services as a community care facility pursuant to Health and Safety Code Section 1502(a)(1), (4), (5) or (6); . . . has completed the vendorization process pursuant to Title 17, California Code of Regulations, Division 2, Subchapter 2; and has been assigned a vendor identification number beginning with the letter 'H' pursuant to Title 17, California Code of Regulations, Section 54340(a)(1)." (Cal. Code Regs., tit. 17, § 56002, subd. (a)(41).) Only a "residential service provider" is eligible to receive the ARM rates developed by the DDS pursuant to California Code of Regulations, title 17, section 56900 et seq. (Cal. Code Regs., tit. 17, § 56917.)

 "We adhere to 'the well-established principle that contemporaneous administrative construction of a statute by the agency charged with its enforcement and interpretation, while not necessarily controlling, is of great weight; and courts will not depart from such construction unless it is clearly erroneous or unauthorized.' [Citation.]" (*State Compensation Ins. Fund v. Workers' Comp. Appeals Bd.* (1995) 37 Cal.App.4th 675, 683 [43 Cal.Rptr.2d 660].) As directed by the Lanterman Act, the DDS adopted regulations that require a licensed community care facility to be vendorized by a regional center in order to receive the ARM rates. In view of the statutory and regulatory scheme, we construe the phrase "use the residential facility rates established by the State Department of Developmental Services" in former section 11464 to require the DSS to use not only the monetary component of

the rate but also the framework governing the setting and payment of the ARM rates. This construction harmonizes section 4684 and former section 11464 so that no part of either statute is surplusage and establishes a "compatible interplay" between the statutes. (*Mar v. Sakti Internat. Corp.* (1992) 9 Cal.App.4th 1780, 1784 [12 Cal.Rptr.2d 388] [Code Civ. Proc. provision that permitted right of intervention under provision of law upon timely application deemed to incorporate the time limits of the Lab. Code provision governing right of intervention].)

Public policy considerations further warrant construing the reference in former section 11464 to the residential facility rate to incorporate a vendorization requirement. (See *Behan v. Alexis* (1981) 116 Cal.App.3d 403, 406 [172 Cal.Rptr. 132] [courts should interpret statutes to accomplish their legislative objective while accommodating important statutory and policy considerations].) The Legislature developed an equitable system of payments for developmentally disabled persons in out-of-home facilities and directed that the rate of payment "ensure that the provider can meet the special needs of persons with developmental disabilities and provide quality programs required by this article." (§ 4680.) The ARM rates take into account multiple components of a developmentally disabled individual's care, including basic living needs, direct supervision, and special services—the latter of which encompasses "specialized training, treatment, supervision, or other services which the individual program plan of each person requires to be provided by the residential facility in addition to the direct supervision provided pursuant to the person's individual program plan in subdivision (b)." (Former § 4681.1, subd. (b)(3).)

The applicable regulations specify the program design and staffing ratios that service level 1 through 4 facilities must possess in order to be approved to provide direct supervision and special services at a specified level. (Cal. Code Regs, tit. 17, §§ 56002, subds. (a)(14), (44), (48), 56004–56005.) The ARM rates paid to these facilities are calculated on the basis of multiple factors relating to the services provided by, and the service level of, the facility. (Cal. Code Regs, tit. 17, §§ 56910–56915.) Service level 1 through 4 facilities must be vendorized by a regional center. (Cal. Code Regs, tit. 17, § 56004, subd. (b).) One purpose of the vendor application is to confirm that the facility is capable of providing, and certified or licensed to perform, the services it seeks to provide. (Cal. Code Regs, tit. 17, § 54310.) A regional center's review of the vendor application, approval or denial of the application, and subsequent quality assurance monitoring and evaluation of the vendor serve as safeguards to help assure that the developmentally disabled are receiving appropriate services and supports from qualified vendors. (Cal. Code Regs, tit. 17, §§ 54320, 54322, 56046–56056.) Dispensing with the vendorization requirement would eliminate these safeguards, to the detriment of developmentally disabled individuals for whom the state is responsible.

Construing section 11464 to incorporate the requirements necessary for a licensed community care facility to receive the ARM rates does not violate any principle of law or policy. We—as did the trial court—reject appellants' argument that regional center vendorization contravenes the federal AFDC-FC requirement that a single state agency administer the foster care program. (See 45 C.F.R. § 205.100(a)(1)(ii), (b)(1) (2007).) Appellants argue that requiring a regional center to vendorize a facility before it will receive a particular rate payable through AFDC-FC is an improper delegation of the DSS's responsibility for the placement and care of foster children. (See § 11404, subd. (a).) To contrast the regional center's role, they cite *Arizona St. Dept. of Pub. W. v. Department of Health, E. & W.* (9th Cir. 1971) 449 F.2d 456, 472, where the court observed that the establishment of a federally mandated advisory committee did not violate the single state agency rule, as "[w]ith or without the advisory committee, the responsibility for making the actual administrative decisions and for implementing them rests in a single set of hands—those of the state agency."

Appellants' authority, however, serves only to highlight that the vendorization requirement does nothing to usurp the DSS's role as the single state agency responsible for administering foster care. Vendorization does not interfere with the DSS's placement decisions. As the trial court noted in its prior order sustaining the DSS's demurrer with leave to amend, county welfare departments retain discretion to place a dual agency child in a licensed community care facility that has not been vendorized; the consequence of doing so is not that the child is removed but simply that the facility does not receive the ARM rates. Indeed, nothing about the vendorization requirement precludes a county social worker from developing a case plan that specifies a nonvendorized placement for a dual agency child. (See § 11400, subd. (b).) Correspondingly, nothing precludes a licensed community care facility where a dual agency child is placed from seeking vendorization. (See Cal. Code Regs., tit. 17, § 56003, subd. (a) [regional center is mandated to provide periodic residential services orientations "for all persons who wish to become vendorized to provide services pursuant to Subchapter 4"].)

Moreover, the DSS continues to be the department "designated the single organizational unit whose duty it shall be to administer a state system for establishing rates in the AFDC-FC program." (§ 11460, subd. (a).) Foster care rates are designed to cover the "care and supervision" of a foster child, which "includes food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable

travel to the child's home for visitation."[5] (§ 11460, subd. (b).) The ARM rates, on the other hand, are designed to compensate licensed community care facilities for the provision of direct supervision and specialized services tailored to meet the objectives of an individual program plan. (§ 4861.1.) A regional center's vendorization of a licensed community care facility provides assurance that the facility can provide such services above and beyond care and supervision. (See Cal. Code Regs., tit. 17, §§ 54310–54326.) It constitutes an integral part of the rates "established" by the DDS that are incorporated as foster care rates pursuant to section 11464.

Indeed, the single state agency requirement does not prohibit various state agencies from working in tandem and utilizing each other's expertise. For example, in *Giles v. Horn* (2002) 100 Cal.App.4th 206, 239–240 [123 Cal.Rptr.2d 735], the court determined that a county's contracting out certain case management work under the CalWORKS program did not violate the single state agency rule. Relevant here, the court discussed the legislative history of 45 Code of Federal Regulations part 205.100 contained in 54 Federal Register 42146 (Oct. 13, 1989), which states in part: " 'The single State agency principle does not preclude the purchase of services from other State agencies, nor is it designed to set aside the cooperative relationships that are normal and proper within a State. Purchase of services and working cooperatively with other agencies are, however, different from delegating administrative responsibility for performance of functions required under State and Federal laws to other agencies or individuals. The State may make use of the expertise of other agencies as long as the State IV-A agency does not delegate administrative decision-making authority.' " (*Giles v. Horn, supra,* at p. 240; see also *RCJ Medical Services, Inc. v. Bonta* (2001) 91 Cal.App.4th 986, 1008–1013 [111 Cal.Rptr.2d 223] [Department of Health Services' delegating audit authority to State Controller's office did not violate federal Medicaid Act's single state agency requirement].) The DSS's requiring vendorization for facilities seeking payment of the ARM rates under section 11464 is not a delegation of its authority, but rather, constitutes part of the cooperative relationship between the DSS and DDS that is necessary to meet the needs of dual agency children. (See former § 4684 ["Regional centers shall accept referrals for evaluations of AFDC-FC eligible children and assist county welfare and probation departments in identifying appropriate placement resources for children who are eligible for regional center services."].)

We likewise reject appellants' related contention that the trial court improperly relied on provisions of the Lanterman Act to require vendorization

---

[5] Notwithstanding the statutes governing dual agency children, the DSS retains discretion to pay a " 'specialized care increment,' " which "means an approved amount paid with state participation on behalf of an AFDC-FC child requiring specialized care to a home listed in subdivision (a) in addition to the basic rate." (§ 11461, subd. (e)(1).)

of facilities seeking the ARM rates pursuant to section 11464. Appellants contend that because section 11464 addresses foster care rates, "use" of the ARM rates is limited only to the considerations governing foster care rates set forth in sections 11460 and 11461. We cannot read section 11464 in a vacuum. (E.g., *Moore v. Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32] ["every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect"]; *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 505 [108 Cal.Rptr.2d 10] [" 'a statute is not to be read in isolation; it must be construed with related statutes and considered in the context of the statutory framework as a whole' "].) In enacting the Lanterman Act, the Legislature recognized that the needs of the developmentally disabled should be paramount, stating "[t]he complexities of providing services and supports to persons with developmental disabilities requires [*sic*] the coordination of services of many state departments and community agencies to ensure that no gaps occur in communication or provision of services and supports." (§ 4501.) The plain language of former section 11464 refers directly to the Lanterman Act, providing that the dual agency children covered by that statute are "regional center clients," which means they have been assessed to have a developmental disability that renders them eligible for regional center services. (See § 4648; Cal. Code Regs., tit. 17, § 54010, subd. (b).) It is only because those children are eligible for regional center services under the Lanterman Act that the issue of the ARM rates arises in the first instance. (§ 4648; Cal. Code Regs., tit. 17, § 54302, subd. (a)(54).) Construing section 11464 to incorporate the use of the ARM rates but not the balance of the statutory and regulatory scheme governing them would eviscerate the purpose of the ARM rates to assure that a dual agency child will in fact receive needed services and supports.

Finally, the trial court's reliance on the all county letters affords no basis for reversal of the order sustaining the demurrer. In taking judicial notice of ACL 87-64 and ACL 98-28, the trial court concluded they were relevant because they disclosed a consistent, long-standing practice by the DSS to require that licensed community care facilities be vendorized to receive the ARM rates. It expressly ruled that the letters were not independently entitled to judicial deference because they were not issued in accordance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.). (See *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 570–571 [59 Cal.Rptr.2d 186, 927 P.2d 296].) But the trial court properly exercised its discretion in taking judicial notice of the All County Letters. (See *Salazar v. Upland Police Dept.* (2004) 116 Cal.App.4th 934, 946 [11 Cal.Rptr.3d 22] [judicial notice ruling reviewed for abuse of discretion]; *Washington v. County of Contra Costa* (1995) 38 Cal.App.4th 890, 901 [45 Cal.Rptr.2d 646] [same].) As official acts of the state's executive department, ACL 87-64 and

ACL 98-28 were proper subjects of judicial notice. (Evid. Code, § 452, subd. (c); *California Advocates for Nursing Home Reform v. Bonta'* (2003) 106 Cal.App.4th 498, 515-516, fn. 8 [130 Cal.Rptr.2d 823] [judicial notice of All County Letters].)

Moreover, the trial court was entitled to "accord 'great weight and respect' " to the DSS's interpretation of sections 4684 and 11464, as the DSS possessed expertise in dealing with the needs of dual agency children and the All County Letters indicated that senior officials had carefully considered how responsibility for addressing those needs should be handled by the county welfare departments in coordination with the regional centers. (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436 [2 Cal.Rptr.3d 699, 73 P.3d 554] [court deferred to the DSS's interpretation of adoption law expressed in an All County Letter]; see also *Megrabian v. Saenz* (2005) 130 Cal.App.4th 468, 486 [30 Cal.Rptr.3d 262] [evidence of long-standing DSS interpretation of regulation policy entitled to deference].)

In any event, the trial court's reliance on the All County Letters was unnecessary to its conclusion that the statutory scheme governing dual agency children requires that the licensed community care facilities *into* which those children are placed by the DSS through the county welfare departments must be vendorized by a regional center to receive the ARM rates created by the Lanterman Act. The All County Letters merely confirmed that the DSS has acted in conformity with the applicable statutory and regulatory scheme.

C. *Appellant's Allegations Failed to Establish That the DSS Was Estopped to Rely on the Statutory Scheme.*

In the FAMC, appellants sought to establish that the DSS was estopped to deny payment of the ARM rates. They alleged that, despite the DSS's asserted policy and practice of requiring vendorization for receipt of the ARM rates, "over the years" the DSS had placed "hundreds of dual agency children" in nonvendorized licensed community care facilities; it had paid the ARM rates on behalf of dual agency children placed in nonvendorized licensed community care facilities; and it had failed to notify other nonvendorized facilities of the availability of the ARM rates or how to obtain them. The trial court summarily rejected appellants' contention that these facts formed the basis for an argument that the DSS was estopped to deny payment of the ARM rates to nonvendorized facilities. The trial court ruled: "Plaintiffs' 'estoppel' argument really is nothing more than a restatement of their contention that, when a county welfare department decides to place a dual agency child in a foster family home, DSS is required to pay the additional section 11464 rates automatically because the placement has been determined

to be appropriate. This argument is contrary to the statutory and regulatory scheme, as explained at length in this court's prior Opinion and Order." We find no error.

■ While the doctrine of equitable estoppel may be applied against the government where justice and right require, it will not be applied if doing so would effectively nullify a strong rule of policy adopted for the benefit of the public. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423].) To apply the equitable estoppel doctrine, four elements must be present: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*Id.* at p. 489.) If those elements are established against the government, the court must then balance the burden on the party asserting estoppel if the doctrine is not applied against the public policy that would be affected by the estoppel. (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 400–401 [261 Cal.Rptr. 310, 777 P.2d 83].)

Appellants' allegations satisfied none of the requisite elements. With respect to the DSS's knowledge of the facts, appellants alleged that the DSS placed dual agency children into nonvendorized facilities. But the vendorization requirement dictates whether the licensed community care facility is eligible to receive the ARM rates, not whether the DSS may place a dual agency child in the facility. Second, appellants did not allege how the DSS intended for any conduct in which it engaged to be acted upon by them. Third, appellants failed to allege they were ignorant of the ARM rates or of the vendorization requirement. Finally, appellants failed to allege that they relied on any action or inaction on the part of the DSS in accepting placement of dual agency children. Appellants' allegations stand in sharp contrast to the undisputed facts in *Canfield v. Prod* (1977) 67 Cal.App.3d 722, 731–733 [137 Cal.Rptr. 27], in which the court found the estoppel elements satisfied where the plaintiff, who was subject to a tax lien and faced losing her home, was unaware of her obligation to pay Social Security taxes and her entitlement to receive additional benefits because of that obligation, and the public agency was aware of such requirements and failed to fulfill its responsibility to notify her of her rights.

Even if there were some manner in which we could construe appellants' allegations to satisfy the elements of equitable estoppel, we would conclude the trial court properly declined to apply the doctrine to save the FAMC because its application would thwart the public policy considerations served by requiring vendorization. *Lentz v. McMahon, supra,* 49 Cal.3d at pages 401 to 402 does not compel a different result. There, the court concluded that

estoppel may be appropriate against a public welfare agency where it negligently or intentionally caused a claimant to fail to comply with a procedural precondition to eligibility, and the failure to apply estoppel would therefore constitute a significant hardship to the claimant. Notably, the *Lentz* court expressly distinguished the type of estoppel appellants seek to invoke here, observing that "[a] more difficult question is posed, however, when estoppel is asserted against the government to defeat *substantive* limitations on eligibility for public benefits. To bar recoupment of benefits from a person whose circumstances did not qualify him for such benefits under applicable substantive eligibility rules might amount to a bestowal of benefits not contemplated by the Legislature." (*Id.* at p. 402.)

The trial court correctly determined that appellants failed to allege the elements of estoppel and that, in any event, their estoppel argument was contrary to the statutory and regulatory scheme.

D. *The Trial Court Properly Exercised Its Discretion in Denying Leave to Amend.*

In its order sustaining the demurrer to the FAMC without leave to amend, the trial court reiterated the limitation of its prior order, explaining that it had permitted appellants "to 'amend their complaint to limit this action to a class of dual agency children who have been placed in vendorized licensed community care facilities . . . .' " Appellants did not amend their complaint so as to limit the class of individuals and facilities seeking relief; instead they added allegations to support their equitable estoppel theory.

Appellants have the burden to demonstrate that the trial court abused its discretion in denying leave to amend. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) They must show in what manner they can amend their complaint and how that amendment will change the legal effect of their pleading. (*Ibid.*) Appellants have not suggested that they can amend their complaint to conform with the trial court's prior order nor indicated that there is any other manner in which they can amend their complaint to allege claims for relief that are consistent with the statutory and regulatory scheme requiring vendorization. Accordingly, they have failed to meet their burden to show the trial court abused its discretion in denying leave to amend. (See, e.g., *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1091 [32 Cal.Rptr.3d 483, 116 P.3d 1162]; *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 [96 Cal.Rptr.2d 354].)

## DISPOSITION

The judgment of dismissal is affirmed. The DSS is entitled to its costs on appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 12, 2008, S167824.